UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

UNITED STATES OF AMERICA )
)
v. ) 1:09-cr-144
) COLLIER/CARTER
WATKINS STREET PROJECT, LLC, et al. )

REPORT AND RECOMMENDATION

I. Introduction

Defendants Donald Fillers and the Watkins Street Project, LLC are charged with violations of various federal environmental laws related to the alleged improper disposal of asbestos. Defendants move to suppress evidence (Docs. 84 and 77) on the ground that samples containing asbestos were obtained from defendants' lot by employees of the Hamilton County/ Chattanooga Air Pollution Control Bureau (APCB) in violation of the defendants' Fourth Amendment rights.[1] The undersigned finds warrantless entry onto the defendants' property was lawful for two independent reasons: (1) defendants had no subjective expectation of privacy in the lot, and (2) the lot constituted an open field under the open fields doctrine. Further, warrantless seizure of the samples containing asbestos was lawful pursuant to the plain view doctrine. Accordingly, it is RECOMMENDED the defendants' respective motions to suppress be DENIED.

_____

[1]These motions are pending before the undersigned Magistrate Judge having been referred by the District Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (C).

1

## II. Relevant Facts

The undersigned held an evidentiary hearing on the defendants' motions to suppress on May 20, 2010. There were six witnesses: John Schultz, Kathy Jones, Richard Jardine, Gary Fillers,  Bob Colby and Michael Gray.[2]  They testified as follows:

### John Schultz

John Schultz is and has been an investigator for the APCB for 13 years.  Robert Colby is his supervisor.  Schultz has received specialized training on the subject of air pollution and the proper manner in which to respond to complaints of air pollution.  He has also received some training on the open fields doctrine.  In February of 2005, he received a five day training course on asbestos which covered the use of protective gear, proper handling, how to visually identify substances which may contain asbestos, and what types of materials normally contain asbestos. The most common substance he saw at training to contain asbestos was pipe wrap, insulation wrapped around pipes.  He also learned that the older a structure is the more likely it will contain asbestos in pipe wrap, floor tiles, and roofs.  To identify with certainty a substance as containing asbestos, a laboratory test is required.   He investigates all suspected violations of air pollution ordinances and regulations in Hamilton County including illegal burning, visible emissions, odors, asbestos, and chemical releases.

On September 8, 2005, Schultz was on routine patrol in the Chattanooga area, at the corner of Watkins Street and 18th Street, when he observed the property owned by the defendants

---

[2]The deposition of Herbert Warden of ADC Systems, Inc. was also submitted as part of the evidence.   ADC Systems, Inc. had conducted some asbestos abatement work at the Watkins Street Property approximately a year prior to the events in question on September 8 and 9, 2005.  This testimony was irrelevant to the issues presented to the undersigned by the defendants' motions to suppress.

and at issue in these motions (herein after referred to as the Watkins Street Property or the property). The Watkins Street Property is the site of the former Standard Coosa Thatcher yarn manufacturing facility. A daycare is located on Dodds Avenue approximately 150-200 feet from the Watkins Street Property.

The Watkins Street Property forms, roughly, a rectangle and is bordered by 17th Street to the north, 18th Street to the south, and Watkins Street to the west. Both 17th Street and 18th Street run, roughly, east to west. Watkins Street runs, roughly, north to south. A concrete retaining wall runs along 18th Street separating the Watkins Street Property from a public sidewalk. At the corner of Watkins Street and 18th Street, the wall is approximately five feet nine inches tall. As one walks east from the corner of 18th Street and Watkins Street down the sidewalk along 18th Street, the retaining wall becomes shorter and shorter until it is only a few inches high and can be stepped over easily. At the corner of Watkins Street and 18th Street, ground level on the Watkins Street Property is much higher than the sidewalk; however, as one walks east along 18th Street, ground level on the Watkins Street property gradually slopes down (or the sidewalk slopes up) until the ground on both sides of the retaining wall are even.

Standing at the corner of Watkins Street and 18th Street looking over the concrete retaining wall into the Watkins Street Property, Mr. Schultz saw what appeared to be a demolition site with debris scattered across an entire city block. It was obvious that buildings had been torn down. Only one building, which appeared to be gutted, still stood on the lot. By looking at the other buildings around the Watkins Street Property, he determined that the demolished buildings had been very old. He knew that old buildings typically have asbestos wrap on pipes. There did not appear to be any business whatsoever being conducted on this property.

Debris was everywhere on the Watkins Street Property, piled two to three feet above the retaining wall. Some debris was hanging off the side of the retaining wall over the sidewalk and even falling *onto* the public sidewalk. Schultz was especially concerned about pipes hanging over the retaining wall because the pipes were wrapped with a material he recognized as likely to contain asbestos. Some of the pipe wrap had fallen onto the public sidewalk. This wrap "immediately sent up a red flag." (Transcript of Suppression hearing at p. 16, Doc. 200)[3]. He also could see from the sidewalk a pipe coming out of the side of a wall of the one remaining structures on the property. That pipe also had wrap on it which Schultz believed likely to contain asbestos. Schultz was particularly concerned in regard to this property with friable asbestos. Friable asbestos is asbestos containing material that crumbles easily, simply with hand pressure or by stepping on it. Friable asbestos can become airborne and cause serious disease. Other debris on the Watkins Street Property was strewn about in a chaotic manner, including bricks, mangled metal sheeting with sharp, jagged edges, more metal pipes with fraying wrap likely to contain asbestos, and splintered, broken wood containing nails. Much of this debris was plainly visible to the naked eye from the sidewalk. Schultz opined this debris was also hazardous.

It was obvious to Schultz that no effort whatsoever had been made to keep people out of this area. There was no gate, no security guard, and no barrier to keep people off the property. Anyone could step onto the property from the east end of 18th Street. There were also no signs posted to inform the public to stay out or to indicate that the area was a demolition site and/or that entry onto the site was hazardous or would be considered trespass. Schultz walked on the

---

[3] All references to the Suppression hearing transcript shall hereinafter be cited as "Tr. at ___."

4

Watkins Street Property on September 8, 2005 for about 15 minutes to investigate. He did not take any samples at this time.

After making his initial inspection on September 8, 2005, Schultz contacted Bob Colby and Kathy Jones with the APCB to inform them that materials believed to contain asbestos were out in the open at the Watkins Street Property. At that time, Schultz did not know who owned the property, but Kathy Jones was able to give him this information. Kathy Jones was and is the manager for the asbestos program for the APCB. Schultz explained that asbestos must be removed in a specific manner and removal requires a permit from the APCB. Jones informed Schultz that defendants had applied for and received an asbestos abatement permit. Jones did not, however, have a survey of the property which would show the areas within the Watkins Street Property known to have asbestos. Schultz also testified that, according to city regulations, once asbestos has been removed from the property, the APCB has ten days before demolition may go forward in which to inspect the property to determine if the asbestos has been properly and completely removed. Schultz testified that inspection is not mandatory but that the regulations allow the APCB to conduct one if it desires. According to the APCB's permit, the property owners were allowed to begin removal of the asbestos on September 27, 2004. Schultz testified the APCB is permitted to conduct inspections before, during, and after asbestos remediation.

On September 9, 2005, the day following Schultz's initial inspection, at approximately 10:00 am, Schultz and Kathy Jones met at the Watkins Street Property. Kathy Jones collected three samples from the debris on the southwest corner of the property to test for asbestos. The sampling results took several days to obtain, but two of the three samples came back positive for asbestos.

5

They did not obtain a search warrant to enter the property and take the samples. Shultz testified if he had wanted a search warrant, he had time to obtain one, but he did not think he needed a search warrant. There was no ongoing demolition or other work occurring on the Watkins Street Property on September 8 and 9, 2005.

Schultz testified that sometime between September 9 and September 12, 2005, some debris on the property had been disturbed, but he did not know by whom. On September 13, 2005, the APCB put up warning tape and signs advising people to stay out and that the area may contain hazardous asbestos.

Pictures of the area presented by the government as exhibits during the suppression hearing support Schultz's testimony. Pictures taken by Schultz on September 8 and 9, 2005, from the vantage point of 18th Street show debris consisting of chunks of concrete, wood and rusty metal lying broken, twisted, crumbled, splintered, or mangled on the Watkins Street Property. There is no discernable organization or arrangement to the manner in which debris lay on the lot. Photographs show the construction debris piled several feet above the retaining wall. Long boards or pieces of metal spill over the retaining wall onto the sidewalk obstructing passage. At the bottom of the retaining wall, on the sidewalk, lie small piles of a crumbled substance and broken, splintered boards. One photograph in particular, Gov. Ex. 1, shows a white crumbled material on the sidewalk just below the pipe, with its frayed wrappings, which hangs over the retaining wall. This same photograph also shows what appears to be a rusty barrel sitting on the sidewalk. The photographs show no fences or other barriers to prevent persons from accessing the Watkins Street Property from the east end of 18th Street and show no signs warning of danger or prohibiting entry.

<u>Kathy Jones</u>

6

Kathy Jones is the asbestos program coordinator with the APCB. She receives applications for asbestos abaitment, inspects buildings, accepts payments on behalf of the APCB for permits, and write permits. She has received considerable training concerning identification of suspected asbestos containing materials and has accreditation to do so from the State of Tennessee. She has learned in her training that those materials which typically contain asbestos include pipe insulation and sprayed ceilings. There are two ways to test for asbestos. Bulk sampling and air sampling. Bulk sampling means one takes a sample of the actual material believed to contain asbestos. Air sampling consists of sampling the air for asbestos fibers. On September 9, 2005, she took bulk sampling.

She described the site on September 6, 2005, as a huge demolition mess with debris hanging off the wall and debris falling onto the sidewalk. There were no signs instructing people to stay out, there were no fences, no red tapes, no barrier to keep people from the property. She saw a person, a member of the public, picking through the rubble on the property. There was one warehouse left standing that was not occupied. One edge of the property contained a cement retaining wall which became shorter at the other end of the property. They were able to walk over the wall and gain entry at this end of the property. Without a search warrant, she took three samples of pipe wrap at the request of her director, from the property. The samples were lying out on the ground; she had no need to dig through rubble for the samples. They were in plain view as she stood on the property. She either used a glove or a bag turned inside out to take the samples. The samples were mailed to a laboratory in Georgia which tested them and determined that two of the three samples were positive for asbestos containing materials. She was aware of who owned the property at the time she took the samples because she had written the permit which was given to the defendants for asbestos remediation of the Watkins Street Property. Contractor

7

Mathis was to do the remediation. Once asbestos is co-mingled with other materials, all the material is treated as containing asbestos and must be disposed as such.

On September 20, 2005, she went back to the site and walked through it with Don Fillers, who had no objections to her presence on the Watkins Street Property. There was a daycare located approximately a football field length from the property in question.

Richard Jardine

Richard Jardine is an on-scene coordinator for the Environmental Protection Agency (EPA) superfund division. His duty station is Atlanta, Georgia. He provides emergency response coordination for the EPA and has been in this position for eleven years. Prior to this position, he was an environmental engineer with the Army. His job is to clean up hazardous waste at pollution sites and to protect human health and environment. The EPA's first objective is to contain hazardous material and then to remove it.

On September 16, 2005, the EPA received a call from the APCB regarding the Watkins Street Property at approximately 2:00 pm. He was immediately dispatched to Chattanooga and as he drove up from Atlanta he spoke with his section chief, some individuals with the APCB, and Gary Fillers about the site. He arrived there at approximately 6:00 pm and was met by Bob Colby, John Shultz, and Kathy Jones of the APCB, Gary and Don Fillers, and the Fillers' attorney, Kyle Weems. There had been a heavy rain that afternoon which was good because it wetted down the friable asbestos materials and kept it from dispersing into the air.

When he viewed the Watkins Street Property, it looked like a "Haiti earthquake site." Barrels, drums, and large amounts of debris were strewn all about. The area looked abandoned. There was nothing to keep people off the site. The barrels and drums caused him serious concern. There were numerous "poly drums" which are drums that are made out of a poly-synthetic

8

material rather than metal. These often contain corrosives, something you would not put in a metal barrel. He also saw what looked like a large cylinder or boiler lying on its side which could have mercury switches in it and would probably have pipes wrapped in asbestos material in it. There was a sign on one of the buildings stating "circulating caustic" which concerned him because it makes reference to potentially hazardous materials. He was told that asbestos abaitment had been commenced but not completed before demolition. Gary Fillers stated they had hired someone to do the abaitment, but they had walked off. The site was "stagnant" when he arrived there. There was nothing to keep exposure to the public from occurring. The Fillers had no objection to him walking through the property on September 16, 2005. After his visual inspection of the property, he considered it to be an attractive nuisance and a threat to public health as it was adjacent to a residential community and a daycare. He noted that people take metal drums to make barbeques and come on site to obtain copper wire. His last day on site was September 30, 2005. However, before he was replaced with another on-scene coordinator, he was never refused access by the Fillers to the site.

Gary Fillers

Gary Fillers is one of the former owners of the Watkins Street Project. They intended to tear down the old Standard Coosa Thatcher facility and sell off its parts as salvage. Specifically, they had intended to salvage the brick, metals, and wood. As of September 8, 2005, they had not abandoned the building and there were other buildings to be knocked down. No-one from the APCB got permission on September 8 or 9 to go onto the premises and take a sample. The Standard Coosa Thatcher property covered over one city block.

9

Bob Colby

Bob Colby is and has been the director of the Hamilton County/Chattanooga Air Pollution Control Bureau since October 1990. Kathy Jones has worked for him since 2004 as the air monitoring manager and is responsible for a portion of the asbestos program. In 2004, the APCB issued a permit for asbestos abaitment for the Watkins Street Project. Kathy Jones prepared the permit. On September 8, 2005, John Schultz called regarding the Watkins Street Property stating that it appeared asbestos containing material was out in plain view. Bob Colby went to the site that evening after work and was alarmed. He testified, "it looked like a bomb had gone off."  He saw people walking across the site and noticed there was a daycare located near the site. He instructed John Schultz and Kathy Jones to take samples for asbestos. On September 12, 2005, he received the results of the tests and contacted the Tennessee Department of Environmental Conservation which then called the EPA.

Michael Gray

Michael Gray is an environmental consultant and has been in the environmental industry for 23 years. He conducted the asbestos survey for the Watkins Street Project, and he gave the survey to Gary Fillers in 2004.

### III. Analysis

Defendants contend that Schultz and Jones, acting on behalf of the APCB, violated the Fourth Amendment when they entered onto the Watkins Street Property, walked around, made

10

visual observations on the property, and then took three samples of pipe wrap for asbestos testing. Consequently, defendants argue, evidence of asbestos found in the samples must be suppressed.

Analysis of these motions shall be divided into two stages: (1) entry onto and continued visual observation on the Watkins Street Property and (2) taking the three pipe wrap samples. Both implicate expectations protected by the Fourth Amendment, but the expectations are not the same. The entry onto and continued visual observation on the Watkins Street Property constituted a search while the taking of the samples constituted a seizure. The Fourth Amendment protects a person's right of privacy by prohibiting unreasonable searches; the Fourth Amendment protects a person's possessory interests in property by prohibiting unreasonable seizures. *Soldal v. Cook County, Illinois*, 506 U.S. 56, 63 (1992) ("'A *search* occurs when an expectation of privacy that society is prepared to consider reasonable is infringed. A *seizure* of property occurs where there is some meaningful interference with an individual's possessory interests in that property.'") (emphasis added) (quoting *United States v. Jacobsen*, 466 U.S. 109, 113 (1984)); *see also Horton v. California*, 496 U.S. 128 (1990) ("The right to security in person and property protected by the Fourth Amendment may be invaded in quite different ways by searches and seizures. A search compromises the individual interest in privacy; a seizure deprives the individual of dominion over his or her person or property"); *Arizona v. Hicks*, 480 U.S. 321, 328 (1987) ("the interest protected by the Fourth Amendment injunction against unreasonable searches is quite different from that protected by its injunction against unreasonable seizures.")

## A. Entry and Continued Observation on the Watkins Street Property

Schultz's and Jones' warrantless entry onto and continued observation on the Watkins Street Property on September 8 and 9 did not constitute an unreasonable search prohibited by the Fourth Amendment for two separate and independent reasons: (1) defendants exhibited no actual

11

expectation of privacy in the Watkins Street Property and (2) Schultz's and Jones' entry onto and continued observation on the Watkins Street Property was proper under the open fields doctrine.

### 1. Subjective Expectation of Privacy

"'It is well-established that a defendant claiming that a search violated his Fourth Amendment rights has the burden of demonstrating that he had a legitimate expectation of privacy in the place that was searched.'" *United States v. Mastromatteo*, 538 F.3d 535, 544 (6th Cir. 2008) (quoting *United States v. Talley*, 275 F.3d 560, 563 (6th Cir.2001)). Absent a legitimate expectation of privacy in the premises searched, the Fourth Amendment offers no protections to the defendant against police intrusions into the premises searched. *See United States v. Hunyady*, 409 F.3d 297, 300 (6th Cir. 2005) (the "capacity to claim the protection of the Fourth Amendment depends upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place.") (quoting *Rakas v. Illinois*, 439 U.S. 128, 143 (1978)).

When considering whether a defendant has met his burden to establish that he had a legitimate expectation of privacy in the place searched, a court must conduct a two part analysis. First, the court must ask "whether the individual, by his conduct, has exhibited an actual expectation of privacy; that is, whether he has shown that he sought to preserve something as private." *Bond v. United States*, 529 U.S. 334, 338 (2000) (internal citation omitted); *United States v. Fitzgerald*, 499 F.3d 596, 601 (6th Cir. 2007) ("In order to be afforded protection under the Fourth Amendment, a person must exhibit a subjective expectation of privacy...."); *accord, United States v. Waller*, 426 F.3d 838, 844 (6th Cir. 2005); *United States v. King*, 227 F.3d 732, 743 (6th Cir. 2000).

12

Second, the court must "inquire whether the individual's expectation of privacy is one that a society is prepared to recognize as reasonable." *Bond*, 529 U.S. at 338 (internal citation omitted); *accord, Waller*, 426 F.3d at 844; *King*, 227 F.3d at 743.

It is this first prong in the two step analysis that the undersigned finds particularly significant in this case. In *King*, 227 F.3d at 744, the Sixth Circuit discussed a number of factors to be considered when addressing the issue of expectations of privacy:

> ... a property right alone is not determinative of whether the [defendant] reasonably expected freedom from governmental intrusion. Other factors include whether the defendant has the right to exclude others from the place in question; whether he had taken normal precautions to maintain his privacy; whether he has exhibited a subjective expectation that the area would remain free from governmental intrusion; and whether he was legitimately on the premises.

(Internal citation omitted); *accord, Waller*, 426 F.3d at 844.

Defendants had a property right in the Watkins Street Property on September 8 and 9, 2005, and, concomitantly, on September 8 and 9, 2005, defendants had a right to exclude the public from it, but defendants did not do so. The evidence presented at the evidentiary hearing on defendants' motions to suppress is unequivocal that defendants took no actions whatsoever to maintain their privacy in the Watkins Street Property. They posted no signs to keep people off the property. They put up no barrier to prevent people from stepping onto the property. Anyone could step from the sidewalk onto the Watkins Street Property from the east end of 18th Street. Any member of the public looking from the street could see debris, typical of the debris strewn throughout the property, above the concrete wall and spilling into the public sidewalk. There were no visual or actual barriers at all. People were even seen walking across the debris field and picking through the debris. There was no evidence of an ongoing business on the property. As one witness put it, "it looked like a bomb had gone off." The only building left standing on the

13

property was partially demolished. There were no indications this building was in use for any purpose. While Kathy Jones knew defendants had intended to salvage materials from the site, on September 8 and 9, 2005, there was no evidence of such activity. Rather, it appeared this endeavor had been discontinued.

"What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." *Katz v. United States*, 389 U.S. 347, 351 ( 1967). Defendants strenuously argued in their briefs and at the suppression hearing that they intended for the Watkins Street Property and the items on it to remain private and free from public intrusion. The evidence indicates otherwise. Despite what defendants may assert now, on September 8 and 9, 2005, defendants knowingly exposed the Watkins Street Property and everything on it to public view and public intrusion, and defendants did not have a subjective expectation of privacy in the Watkins Street Property.[4] Accordingly, Schultz's and Jones' entry onto and their continued observation on the Watkins Street Property did not constitute an unreasonable search prohibited by the Fourth Amendment.

### 2. Open Fields Doctrine

"[A]s a general matter, warrantless searches 'are *per se* unreasonable under the Fourth Amendment.'" *City of Ontario, Cal. v. Quon*, 130 S.Ct. 2619, 2630 (2010) (quoting *Katz v.*

---

[4]In this case, it really is true that a picture is worth a thousand words. I am attaching to this report and recommendation two photographs taken by John Schultz during one of his visits to the Watkins Street Property on September 8 and 9, 2005. Gov. Ex. 1 and Gov. Ex. 12 show the defendants' utter lack of concern that anyone could see onto the Watkins Street Property and observe much of the contents on it or that anyone might actually enter onto the Watkins Street Property. A third photograph, Gov. Ex. 4-F, is attached to show the retaining wall sloping to the ground where any person could easily step from the public sidewalk onto the Watkins Street Property. Gov. Ex. 4-F was taken sometime later in September 2005 after the samples at issue were gathered.

*United States*, 389 U.S. 347, 357 (1967)).  Under the open fields doctrine, the government's warrantless intrusion upon open fields is not an unreasonable search proscribed by the Fourth Amendment.  *Oliver v. United States,* 466 U.S. 170, 177 (1984).  Thus the open fields doctrine provides an exception to the warrant requirement under the Fourth Amendment.

The genesis of the open fields doctrine is found in *Hester v. United States*, 265 U.S. 57, 59 (1924) wherein Justice Holmes explained, "[T]he special protection accorded by the Fourth Amendment to the people in their 'persons, houses, papers, and effects,'" is not extended to the open fields.  ...  It might be a trespass at common law, but it is not an unreasonable search under the Fourth Amendment."  *Oliver,* 466 U.S. at 176 (quoting Hester, 265 U.S. at 58).  Simply put, an "open field" is not a person, house, paper, or effect under the Fourth Amendment, and thus no legitimate expectation of privacy lies for Fourth Amendment purposes.  *Oliver*, 466 U.S. 176 - 181.

Defendant argues an open field, as defined under the open fields doctrine, must be farmland, wooded areas, or wooded land that has been cleared.  However, the definition of open fields is not so narrow.  As explained by the *Oliver* Court*:*

> It is clear, however, that the term "open fields" may include any *unoccupied or undeveloped* area outside of the curtilage.[5]  An open field need be neither "open" nor a "field" as those terms are used in common speech. *For example*, .... a thickly wooded area nonetheless may be an open field as that term is used in construing the Fourth Amendment.

_____

[5]  The "curtilage of a dwelling [is] the area to which extends the intimate activity associated with the sanctity of a man's home and the privacies of life. " *Dow Chemical Co. v. United States*, 476 U.S. 227, 235-36 (1986).  It is, generally, the area immediately adjacent to a home that an individual may reasonably expect will remain private.  *Oliver*, 466 U.S. at 180.  Defendants do not contend the Watkins Street Property constituted curtilage.

*Oliver*, 466 U.S. at 180 n. 11. (emphasis added). The Watkins Street Property was at one time a developed and occupied piece of property owned by the Standard Coosa Thatcher Company which manufactured yarn. Presumably, the buildings on the Watkins Street Property were used in the manufacturing process and/or housed administrative offices for the Standard Coosa Thatcher Company. However, on September 8 and 9, 2005, the Standard Coosa Thatcher Company had long since ceased operations, and all but one of the buildings had been completely demolished on the site at issue. The remaining building was in a partial state of demolition. The physical description of this particular lot has been thoroughly described in the preceding section of this report and recommendation. On September 8 and 9, 2005, the Watkins Street Property was unequivocally in a state of "un-development," and it appeared unoccupied. There were no salvage efforts occurring at that time nor was there any indication that salvage efforts were still ongoing.[6]

Defendants appear to argue that *any* real property being used for or as a "commercial enterprise" is protected by the Fourth Amendment. Defendants are correct that Fourth Amendment protections have been extended to commercial and business enterprises, but in those instances, Fourth Amendment protections generally apply to the interior of buildings and offices, not an unoccupied or undeveloped area such as the Watkins Street Property. *See Dow Chemical Co. v. United States*, 476 U.S. 277 (1986) ("Dow plainly has a reasonable, legitimate and objective expectation of privacy within the interior of its covered buildings....");*Oliver v. United States*, 466 U.S. 170, 178 n. 8 (1984) ("The Fourth Amendment's protection of offices and

---

[6]The Watkins Street Property could accurately be referred to as a "brownfield." *See* Oxford Dictionaries Online, http://english.oxforddictionaries.com/view/entry/m_en_us1229038# (a brownfield is "an urban site for potential development having had previous development on it.")

16

commercial buildings, in which there may be legitimate expectations of privacy, is also based upon societal expectations that have deep roots in the history of the Amendment"); *Marshall v. Barlows*, 436 US 307, 311 (1978) ("The Warrant Clause of the Fourth Amendment protects commercial buildings as well as private homes"); *see also, McLaughlin v. Elsberry, Inc.*, 868 F.2d 1525, 1530 (11th Cir. 1989) ("the nature of the activity taking place in the open field, be it commercial or otherwise, is insufficient to cloth an open field in fourth amendment protection."); *United States ex rel. Saiken v. Bensinger,* 546 F.2d 1292, 1297 (7th Cir. 1976) ("a search of open fields, without a search warrant, even if such fields are construed as part of a commercial enterprise, is not constitutionally 'unreasonable.'"); *United States v. Elkins*, 300 F.3d 638, 653 (6th Cir. 2002) ("it is clear that areas that adjoin a commercial building but are accessible to the public do not enjoy curtilage-like protection.")

Defendants argue that pursuant to *Dow Chemical Co. v. United States*, 476 U.S. 277 (1986), the Watkins Street Property should not have been entered by Schultz and Jones without a warrant.  In *Dow Chemical*, the Environmental Protection Agency (EPA) conducted aerial surveillance over Dow's 2,000 acre manufacturing complex and took numerous photographs of the facilities.  There was, however, no physical intrusion onto the property.  The Court noted that many of the buildings were covered and that Dow "has maintained elaborate security around the perimeter of the complex barring ground level public views of these areas."  *Id* at 229.  However, manufacturing equipment and piping conduits located between the various buildings were exposed to visual observation from the air.  *Id.*  Dow argued that its exposed manufacturing facilities between the covered buildings were "industrial curtilage" entitled to Fourth Amendment protection from aerial observation by the EPA.  The Court held that such exposed manufacturing facilities "are not analogous to the 'curtilage' of a dwelling for purposes of aerial surveillance;

17

such an industrial complex is more comparable to an open field and as such it is open to the view and observation of persons in aircraft lawfully in the public airspace immediately above or sufficiently near the area for the reach of cameras." *Id.* at 239. The Court pointedly observed that Dow had not taken any precautions against observation of the exposed manufacturing facilities by aerial intrusions. *Id.* at 237 n.4. Further, the Court stated that had there been a physical intrusion onto the property, the outcome of the appeal may have been different: "Dow's inner manufacturing areas are elaborately secured to ensure they are not open or exposed to the public from the ground. Any actual physical entry by the EPA into any enclosed area would raise significantly different questions...." *Id.* at 237. Thus, the Court indicated Dow's "elaborate efforts" to prohibit entry by the public at the ground level may have imbued those areas with Fourth Amendment protections from physical entry.

*Dow Chemical* is inapposite. As discussed in detail, defendants took no measures whatsoever to prevent visual observation of the debris on the Watkins Street Property or to prevent physical entry onto the Watkins Street Property. Therefore, *Dow Chemical* provides the defendants' arguments with no support.

Defendants also argue, with no analysis, that in *Donovan v. Dewey*, 452 U.S. 594, 5960-600 (1981), "the Supreme Court has extended Fourth Amendment protection to stone quarries," and "if the Fourth Amendment extends to stone quarries, it certainly extends to the demolition/reclamation site at 1700 Watkins Street." (Defendants' brief at 8-9, Doc. 201). *Donovan* held that warrantless *administrative* searches of stone quarries pursuant to the Federal Mine Safety and Health Act of 1977 are constitutionally permissible. *Id.* at 606. The majority opinion did not consider the open fields doctrine. In a concurring opinion, Justice Rehnquist found the search was permissible under the open fields doctrine given that "the stone quarry here

18

was largely visible to the naked eye without entrance onto the company's property." *Id.* at 608-09. *Donovan* does not support the defendants' position.

Instead, *Air Pollution Variance Bd v. Western Alfalfa Corp.*, 416 U.S. 861 (1974) is more akin to the instant case. In *Air Pollution Variance Bd,* a state health inspector entered Western Alfalfa Corp.'s outdoor premises without a warrant in order to better view the smoke plume rising from a smoke stack. The Court noted the inspector "did not enter the plant or offices.... The inspector was on respondent's property but we are not advised that he was on premises from which the public was excluded." *Id.* at 865. The Court concluded no Fourth Amendment violation had occurred as the inspector was "well within the 'open fields' exception to the Fourth Amendment approved in *Hester.*" *Id.* Similarly, Schultz and Jones were not in any building or office and were not on the premises from which the public was excluded. I conclude no warrant was required for Schultz and Jones to enter onto and look around on the Watkins Street Property because it was an "open field."

### B. Seizure of the Three Samples - The Plain View Doctrine

Under the Fourth Amendment, warrantless seizures are presumptively unreasonable. *Arizona v. Hicks*, 480 U.S. 321, 327 (1987). The plain view doctrine is an exception to this warrant requirement for seizures of property. *Id.* at 326 ("It is well established that under certain circumstances the police may *seize* evidence in plain view without a warrant." (emphasis original) (quoting *Coolidge v. New Hamphire*, 403 U.S. 443, 465 (1971)); *see also Horton v. California*, 496 U.S. 128, 134-35 (1990) (the plain view doctrine is an "exception that is addressed to the concerns that are implicated by seizures rather than by searches.")

The plain view doctrine permits warrantless seizures of property where: (1) the officer was lawfully in a position from which the object was plainly seen; (2) the object was in plain

19

view; (3) the object's incriminating nature was immediately apparent; and (4) the officer had a lawful right of access to the object. *Horton,* 496 U.S. at 134.

### 1. Application of the Plain View Doctrine in an "Open Field"

It appears the defendants are taking the position that the plain view doctrine can never be applied in an open field to justify a warrantless seizure of personalty. I disagree, and, after examining this issue, I will discuss whether the government can meet the requirements of the plain view doctrine in this case.

According to the defendants, a government official who has entered an "open field" is categorically prohibited from seizing without a warrant obviously incriminating evidence in plain view because the open fields doctrine does not authorize seizure of property. Thus, the argument continues, if a government official wishes to seize evidence in an open field, he must first apply for a search warrant based on what he saw in the open field.

Defendants are absolutely correct that the open fields doctrine does not authorize *seizure* of property on an open field. It is an exception to the Fourth Amendment's prohibition against unreasonable *searches*. It does not address reasonable or unreasonable *seizures* of property, thus it neither permits nor prohibits warrantless seizures. When officers enter an open field and conduct a reasonable, warrantless search of the open field, personalty on the open field continue to have Fourth Amendment protection against unreasonable seizures.[7] *See Oliver,* 466 U.S at 179 n. 10, 180. This fact does not render it a forgone conclusion that valid exceptions to the warrant requirement for *seizures*, such as the plain view doctrine, cannot apply to personalty in an open field. The cases cited by defendants, *Oliver v. United States*, 466 U.S 170, 176 (1984), *United*

---

[7] The Framers understood "effects" to mean personal property. *Oliver,* 466 U.S. at 177 n. 7.

*States v. Dunn*, 480 U.S. 294 (1987), *United States v. Rapanos*, 115 F.3d 367 (6ᵗʰ Cir. 1997) and *Allinder v. Ohio*, 808 F.2d 1180 (6ᵗʰ Cir. 1987), do not require such a result.

  *Oliver v. United States*, 466 U.S. 170 (1984) involved two separate cases wherein police entered onto secluded fields.  With this information, police then obtained warrants and returned to seize the marijuana.  The sole issue before the Court was whether the open fields doctrine applied to permit entry onto the fields despite their seclusion. The Court did not consider whether the marijuana could have been seized prior to obtaining the warrant.  Thus *Oliver* has no precedential value as to this issue.

  In *United States v. Dunn*, 480 U.S. 294 (1987), officers had reason to believe the defendant was manufacturing a controlled substance on his property, and officers went there to investigate. While on the defendant's property, standing in an open field, officers looked into a barn, observed a drug laboratory, and left to obtain a search warrant. *Id.* at 297-99.  The Court found no violation of the Fourth Amendment reasoning that the defendant possessed no expectation of privacy in his open fields or in his barn.  As in *Oliver*, the Court simply did not consider whether the plain view doctrine would have allowed seizure of the incriminating evidence without a warrant.

  In *United States v. Rapanos*, 115 F.3d 367 (6ᵗʰ Cir. 1997), the Sixth Circuit concluded that although government officials could properly enter upon a tract of cleared land for visual observation pursuant to the open fields doctrine, the open fields doctrine did not permit the officials to take plant and soil samples without a warrant to determine if the property at issue was a protected wetland.  *Id.* at 373-74.  In reaching this conclusion, the *Rapanos* court did not address whether the plants and soil observed upon the property were immediately incriminating, and, if so, whether they could have been seized pursuant to the plain view doctrine.  Thus

*Rapanos* also fails to provide insight into the application of the plain view doctrine in an open field.

*Allinder v. Ohio*, 808 F.2d 1180 (1987) addressed the legality of government inspections of bee hives. Pursuant to state law, government officials were entering upon private property to inspect bee hives for contagious diseases. Inspection of a hive required the top cover and numerous layers of the hive to be removed with a special tool in order to reach the bottom layers which were then removed and inspected for signs of disease. If signs of disease were detected, samples were taken and the hive quarantined. Positive results for disease required destruction of the hive to prevent contagion.

The *Allinder* defendants argued the inspection did not amount to a search under the Fourth Amendment because the inspection fell under the open fields exception to the warrant requirement. The court found entry upon the fields where the hives were located did not constitute an unreasonable search pursuant to the open fields doctrine but that the open fields doctrine did not authorize the physical dismantling of the hives. *Id.* at 1184-86. "There is no case... where the open fields doctrine has been applied to allow a search of personal effects or of a commercial structure in a field." *Id.* at 1185. The court reasoned that hives are commercial and personal property amounting to "effects" and "are therefore expressly afforded protection by the fourth amendment," unlike an open field. *Id.* However, the plain view doctrine was *not* considered in this opinion.[8]

---

[8]In *Allinder*, an inspector could not have determined whether a hive was infected just by looking at the outside of it. Thus, had the plain view doctrine been considered, it would not have applied because the hive itself was not immediately incriminating.

Because *Oliver, Dunn, Rapanos and Allinder* did not consider the plain view doctrine, I conclude they do not serve as binding precedent for the issue currently before the undersigned: whether evidence may be seized legally without a warrant from an open field pursuant to the plain view doctrine. *See United States v. L. A. Tucker Truck Lines, Inc.,* 344 U.S. 33, 38 (1952) (A prior decision is not a binding precedent on a point not raised in briefs or arguments nor discussed in the Court's opinion); *Webster v. Fall*, 266 U.S. 507, 511 (1925) ("Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not considered as having been so decided as to constitute precedents.")

The Supreme Court in *Horton*, succinctly explained when application of the plain view doctrine is appropriate: "[w]here the initial intrusion that brings the police within plain view of such an article is supported not by a warrant but by one of the recognized exceptions to the warrant requirement, the seizure is also legitimate." *Horton,* 496 U.S. at 135. Examples of initial intrusions which would permit application of the plain view doctrine included "hot pursuit" and search incident to arrest. *Id*. The touchstone of the Fourth Amendment is reasonableness, *Florida v. Jimeno*, 500 U.S. 248, 250 (1991); *Katz v. United States*, 389 U.S. 347, 360 (1967), and I can see no reasonable basis to exclude the open fields doctrine from the list of recognized exceptions to the warrant requirement which would allow application of the plain view doctrine.

As to every case that the undersigned could find that has *directly* addressed the warrantless seizure of evidence under the plain view doctrine while standing in an open field, the courts have uniformly concluded that the plain view doctrine may apply to permit warrantless seizure of incriminating evidence. For example, in *Waltman v. Payne*, 535 F.3d 342 (5th Cir. 2008); *United States v. Brown*, 2007 WL 2318879 (W.D. Ky. Aug. 9, 2007), and *United States v. Waterfield*, 2006 WL 1645068 (S.D. Ohio June 8, 2006), police had reason to believe that

23

marijuana was being grown in a field. Police lawfully entered open fields without a warrant and lawfully seized marijuana plants without a warrant pursuant to the plain view doctrine. *Waltman*, 535 F.3d at 346-48; *Brown*, 2007 WL 2318879 * 3; *Waterfield,* 2006 WL 1645068 *9; *see also United States v. Thomas*, 2009 WL 424589 (2009) (officers without a warrant lawfully seized firearms in plain view while standing in an open field); *Dunham v. Kootenai County*, 690 F.Supp. 1162, 1174 (D. Idaho 2010) (officers' warrantless entry into horse pens pursuant to open fields doctrine and subsequent warrantless seizure of obviously neglected and malnourished horses pursuant to plain view doctrine did not violate the Fourth Amendment.)

       *2. Application of the Plain View Doctrine to the Facts of this Case*

       As previous stated, *Horton* established the following requirements to seize evidence in plain view: (1) the officer was lawfully in a position from which the object was seen; (2) the object was in plain view; (3) the object's incriminating nature was immediately apparent; and (4) the officer had a lawful right of access to the object. *Horton v. California*, 496 U.S. 128, 134 (1990).

       Jones and Schultz saw the specific samples they gathered *after* they entered onto the Watkins Street Property, not while they were standing on public property.[9] The samples were

_____

    [9]Defendants state in their post hearing brief, [Doc. 201 at p. 14], that Schultz selected the three samples to be seized. In support of this assertion, defendants refer the undersigned to Jones' testimony in the suppression hearing transcript at page 90. Jones testified simply that, "I went to the site and took samples at his [Schultz's] bidding." This statement does not indicate Schultz by himself selected the samples to be taken, only that Schultz asked Jones to take samples. Jones did testify that Schultz pointed out "things" to her that concerned him. (Tr. at 96). Schultz specifically testified that Kathy Jones collected the three samples, [suppression hearing Tr. at 35]. When asked where the samples were taken from, Schultz did not know and responded that counsel would need to ask Kathy Jones. [Tr. at 37, 38]. Jones also testified, "John [Schultz] witnesses my sampling the first three samples."[Tr. at 109]. She also testified, "I didn't actually discover anything because things were pointed out to me by John." [Tr. at 110]. I conclude Schultz and Jones worked together to select the samples. Jones also testified that the samples she took "would have been

located on the Watkins Street Property.  Since the Watkins Street Property is an open field for

purposes of the Fourth Amendment, they did not need a warrant to be on the property.

Consequently, they were lawfully in a position from which the samples were seen, and they had

lawful access to the samples.  Further, the samples collected were lying on the ground in plain

view.  They did not have to move, sift through, or look under other debris to see it.  Accordingly,

the government has met the first, second, and fourth prongs of the plain view doctrine.

Defendants argue the government cannot meet the third prong of the plain view doctrine,

*i.e.* that the incriminating nature of the items seized was immediately apparent.  Quoting *United*

*States v. McLevain*, 310 F.3d 434 (6th Cir.,  2002), defendants state the "[f]actors used to

determine whether the illegal nature of an object was immediately apparent are:

(1) 'a nexus between the seized object and the items particularized in the search warrant,' (2)

'whether the 'intrinsic nature' or appearance of the seized object gives probable cause to believe

that it is associated with criminal activity,' and (3) whether 'the executing officers can at the  time

of the discovery of the object on the facts then available to them determine probable cause  of the

object's incriminating nature.'" (Defendants' post-hearing brief at 13, Doc. 201) (quoting *United*

*States v. McLevain*, 310 F.3d 434, 441 (6th Cir.,  2002)).  In *McLevain*, officers gained lawful

entry with a search warrant into a house where the items in question were found.  In the instant

case, no warrant was necessary to enter onto the Watkins Street Property; therefore, the first

factor is not applicable to this case.  As to the remaining two factors, the *McLevain* court stated,

"we should also note that the Supreme Court does not require that officers *know* that evidence is

---

visible" from South Watkins Street. (Tr. at 100).  But she did not testify that she actually saw the
very samples she collected from the sidewalk before she entered onto the Watkins Street Property.
The samples were lying on the ground and surrounded by other debris, thus it would have been
extremely difficult to see past that debris to the samples collected.

contraband. Instead, probable cause is a flexible, common-sense standard. It merely requires that the facts available to the officer would warrant a man of reasonable caution in the belief that certain items *may* be contraband or stolen property or useful as evidence of a crime." *Id.* at 441 (internal citations omitted, emphasis added); *see also Arizona v. Hicks*, 480 U.S. 321, 326 (1987) (probable cause is required in order to invoke the plain view doctrine.)

    As defendants observe, it was not possible to be certain that the samples seized would contain asbestos; a laboratory test was required for certainty. But the plain view doctrine does not require certainty, only probable cause to believe the items in plain view are evidence of a crime.

    In this case, both John Schultz and Kathy Jones had received appropriate training regarding the types of materials in which asbestos is commonly found. Both Schultz and Jones testified they were taught one of the materials most commonly to contain asbestos is pipe wrap. Kathy Jones knew, and she told Schultz, that the buildings on the Watkins Street Property contained asbestos in the pipe wrap – hence the need for the asbestos removal permit. Based on their training concerning asbestos and their knowledge of the buildings on the Watkins Street Property, Schultz and Jones had probable cause to believe the samples of pipe wrap they collected contained asbestos which, in violation of law, had not been properly contained when the buildings were demolished.

    I understand that as to one sample, Jones disagreed with Schultz's assessment that the sample, which ultimately tested negative, contained asbestos. I do not, however, find this disagreement dissipated probable cause as to the other samples which did test positive for asbestos. As to these samples, both Schultz and Jones agreed the samples likely contained asbestos; this is sufficient. *See e.g., Waltman v. Payne,* 535 F.3d 342, 348 (5th Cir. 2008) (No Fourth Amendment violation occurred where experienced officers disagreed and mistook kenaf

26

plants for similar looking marijuana plants and seized the plants pursuant to the plain view doctrine.)

### C. The Government's Alternative Theories

The government offers alternative theories to justify the warrantless entry onto the Watkins Street Property and the warrantless seizure of the samples; namely, exigent circumstances, a statutory right of entry, and inevitable discovery. Having found on other grounds that no Fourth Amendment violation occurred, it is unnecessary to address these arguments.

### IV. Conclusion

For the reasons stated herein, I conclude Schultz's and Jones' warrantless entry on the Watkins Street Property and their subsequent warrantless seizure of the three samples from the Watkins Street Property did not violate the Fourth Amendment. Therefore, it is RECOMMENDED defendants Donald Fillers and the Watkins Street Project, LLC's respective motions to suppress evidence (Docs. 84 and 77) be DENIED.[10]

s/William B. Mitchell Carter
UNITED STATES MAGISTRATE JUDGE

---

[10]Any objections to this Report and Recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 59(b)(2) of the Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140, 88 L.Ed.2d 435, 106 S. Ct. 466 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive or general. *Mira v. Marshall*, 806 F.2d 636 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370 (6th Cir. 1987).

27