UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | 1:9-CR-144 |
| v. | ) | |
| | ) | Judge Curtis L. Collier |
| DONALD FILLERS, *et al.* | ) | |

## MEMORANDUM

In imposing a sentence under the Clean Air Act ("CAA"), 42 U.S.C. §§ 7401 *et seq.*, a court must consult and consider the applicable United States Sentencing Guideline ("USSG") § 2Q1.2(a). The Court has been faced with such a case. Because this Guideline has specific offense characteristics that can greatly affect a defendant's potential sentence, and because USSG § 2Q1.2(a) has not been the subject of much analysis, the Court has deemed it appropriate to explain its application of § 2Q1.2(a) at greater length than it did at sentencing.

## I.     FACTUAL AND PROCEDURAL BACKGROUND[1]

Defendant Donald Fillers and his brother Gary Fillers[2] formed Watkins Street Project ("WSP") in 2003. The Fillers formed WSP to purchase the Standard Coosa Thatcher ("SCT") site, which sat on two full blocks of Watkins Street in Chattanooga, Tennessee. Located on the site was a textile factory no longer in operation. Donald Fillers and his brother planned to demolish the building and salvage valuable lumber, metal, and other such materials. In close proximity to the site was a day care center and nursery. In the summer of 2003, the Fillers hired Defendant David Wood

---

[1] This recitation of the facts is taken primarily from Defendants' Presentence Investigation Reports.

[2] Gary Fillers previously pleaded guilty to offenses arising from the conduct at issue here.

to assist in the process of demolishing the building and salvaging valuable materials.

When the Fillers purchased the property, the prior owner informed them asbestos was present on the property. WSP contracted with Alternative Actions, Inc. ("AAI"), a certified abatement company, to inspect the premises and produce a report estimating the amount of asbestos on the property and the cost to remove the asbestos. The report noted the following regulated asbestos containing material ("RACM") on the property: 6,126 linear feet of pipe insulation, 348 pipe fittings, 4,293 square feet of equipment insulation, 3,570 square feet of Transite, 1,600 square feet of floor tile/mastic, and 2,440 square feet of oven insulation. AAI's cost estimate for proper removal of all asbestos on the property was $210,000.

In summer 2004, WSP contracted with Defendant James Mathis to perform demolition work on the property. The Fillers provided Mathis with the AAI report and instructed him to obtain cost estimates from certified asbestos abatement companies. Mathis obtained an estimate from SCI Remediation in the amount of $129,250. The Fillers rejected SCI's estimate and informed one of Mathis' employees that the abatement could be done for less money. Donald Fillers then sought estimates from two companies, one of which returned an estimate of $126,542; the other company did not submit a bid.

Gary Fillers then contacted ADC Systems, Inc. and sought another estimate. However, ADC was not provided the AAI report, but instead was given a tour of the site. ADC submitted a quote of $28,900 based on an estimated removal of 1,800 to 2,000 linear feet of pipe insulation, joints and g-fittings, 800 feet of pipe insulation, and 200 square feet of flooring. Although ADC later obtained $40,000 in increases as a result of change orders, the amount of RACM ADC agreed to remove was far below the amount contained in the AAI report.

2

Mathis submitted portions of a ten-day notice for demolition to the Hamilton County Air Pollution Control Board ("APC") in September 2004. This notice included owner information, site location, information about the demolition company, and the name of the abatement contractor, but did not provide estimated amounts of asbestos. Later, The APC received initial figures of asbestos present on the property, which was less than the estimate in the AAI report. Although Kathy Jones sought a copy of the AAI survey, she never received one. Donald Fillers contacted Jones by phone and amended the notice to include RACM figures of 2,000 and 1,200 linear feet of contaminated materials, which was less than one-third the estimate in the AAI report.

Over the next two months, ADC removed asbestos material from the SCT site pursuant to their contract with WSP. Although the contract was limited to certain areas, it is possible ADC removed some material from areas not covered by the contract and may not have removed all asbestos from the contract areas. Halbert Warden of ADC testified at trial to viewing Wood and a female companion placing apparent RACM materials in trash bags, which later ended up in ADC's dumpsters. During ADC's removal process, additional abatement was approved by a change order authorized by WSP. However, when Warden and his father, Herbert, spoke with Donald Fillers about the additional bags being thrown in their dumpsters, an additional change order was not authorized.

While ADC was abating the portion of the SCT building covered by the contract, Wood assembled a crew of nine employees,[3] mostly friends and family, who sorted the salvage material

---

[3] These employees were unskilled laborers who were provided no training in asbestos-related work. They were paid very low wages for their labor. According to the government's arguments, some of these employees were homeless individuals and some were addicted to drugs. The government argued, because of these attributes, they were vulnerable victims under the Guidelines § 3A1.1(b)(1)(A). While the court rejected this assessment, the Court does acknowledge that,

3

in the building. From September 2004 to September 2005, the crew gathered and discarded RACM in violation of regulations. Some of the procedures used by the crew in handling the asbestos containing materials were failing to wet the materials, cutting the materials with power tools, throwing materials out of windows, breaking up materials by hand, leaving materials piled for long periods, mixing the material with other debris to conceal them, and burying the materials. For the most part, the crew wore no respiratory protection or any protective gear during this process. After the crew finished with a portion of the SCT building, Mathis' company would then demolish that portion.

ADC did periodic air monitoring while they were removing RACM, but none of their tests showed significant airborne emissions of asbestos. WSP performed no independent air quality testing during ADC's abatement or during any improper abatement. Testimony at trial discussed dust that emanated from the SCT site during demolition. A Chattanooga City Police Officer, who lived near the site, described his car covered in dust and debris on a daily basis. Further testimony established children at the nearby day care could not play outside due to dust covering the ground and playground equipment. Additionally, employees of Mathis' company expressed concern about the debris. After their concerns were aired, the debris disappeared overnight. One of Mathis' employees expressed concerns about the need for respiratory protection. No respiratory protection was provided to that employee, although Mathis' brother was provided a respirator.

In September 2005, an APC investigator inspected the SCT site as part of a routine patrol. He noticed possible RACM in large piles at the site. The property was not fenced and passersby

---

because of the attributes, these workers would have had fewer alternatives or options when faced with this work environment.

could easily access or be exposed to the materials strewn about the site. The APC investigators took several samples of the materials, some of which tested positive for asbestos. The APC notified the Environmental Protection Agency ("EPA"), which declared the site an imminent threat to human health and the environment. The EPA contacted the Fillers and discussed the suspected violations. The APC was then provided with the AAI report from the Fillers, although several pages were missing. A complete report was later obtained directly from AAI. At the EPA's urging, the Fillers began performing a cleanup plan first using ADC and then using another abatement company called Homeland Environmental Services. The site was cleaned by November 2005.

Defendants Donald Fillers, David Wood, and James Mathis ("Defendants"),[4] were all charged with conspiracy to defraud the United States and violate the CAA, as well as with various violations of the CAA's asbestos work-practice standards. Donald Fillers and Wood were additionally charged with making false statements, and Donald Fillers and WSP were charged with obstruction of justice (Court File No. 1). The government called a number of witnesses over the course of a three-week trial, and at the close of the government's proof, all Defendants filed a motion for acquittal pursuant to Fed. R. Crim. P. 29. The Court reserved ruling at that time. On January 30, 2012, the jury returned a verdict of guilty on all counts against all Defendants, with one exception (Court File Nos. 385-88).[5] On March 1, 2012, the Court denied each Defendant's motion for acquittal (Court File Nos. 402, 403). On March 13, 2012, Donald Fillers and WSP filed a motion

---

[4] Another defendant, Watkins Street Project, was also sentenced at the hearing. However, the Sentencing Guidelines, and therefore the sentencing enhancement discussed in this memorandum, did not apply to Watkins Street Project.

[5] The jury found Mathis not guilty on Count Four of the Indictment, which charged him with failing to have a trained individual present at the Standard Coosa Thatcher site.

5

for a new trial (Court File No. 406).  The Court denied Defendants' motion on May 21, 2012 (Court File No. 424).

From September 20 to October 1, 2012, the Court held a six-day sentencing hearing for Defendants in this case.  Prior to the hearing, Defendants and the government submitted numerous memoranda and exhibits supporting an unusual number of objections to their Presentence Investigation Reports ("PSR").  The Court heard argument from Defendants and the government on a number of objections to their PSRs.  One such objection, made by all Defendants, was to a nine-level offense enhancement assessed pursuant to USSG § 2Q1.2(b)(2). The Court heard hours of argument and received many sentencing exhibits in consideration of this issue.  For the following reasons, the Court denied Defendants' objections and concluded the PSRs properly imposed the enhancement.

## II.    DISCUSSION

### A.    Legal background

Defendants' sentences were driven by their CAA convictions for violations of 42 U.S.C. § § 7412(b) and 7413(c), which were charged in counts one through seven.  Count one charged Defendants with conspiring to defraud the government and violate the CAA work practice standards. Count two charged Defendants with failure to provide an accurate ten-day notice to the EPA and the APC in violation of 42 U.S.C. § 7413(c)(1).  Count three charged Defendants with commencing demolition prior to abatement of asbestos in violation of 42 U.S.C. § 7413(c)(1).  Count four charged Donald Fillers and Wood with failure to have present an individual trained in National Emissions Standards for Hazardous Air Pollutants ("NESHAPs") while demolition work occurred, thereby violating 42 U.S.C. § 7413(c)(1).  Count five charged Fillers and Wood with failure to keep

RACM wet while it was being removed from a facility and failure to adequately pack and seal the components in violation of 42 U.S.C. § 7413(c)(1). Count Six charged Donald Fillers and Wood with failure to lower RACM properly (that is, not dropping, throwing, or otherwise damaging or disturbing it) when it was being removed in violation of 42 U.S.C. § 7413(c)(1). Count seven charged Donald Fillers and Wood with failure to containerize and timely dispose of RACM in violation of 42 U.S.C. § 7413(c)(1).

The appropriate Guideline for violations of the CAA is USSG § 2Q1.2. Defendants' base offense level was eight pursuant to § 2Q1.2(a). The PSR assessed, among others, an enhancement under § 2Q1.2(b)(2), which provides "if the offense resulted in a substantial likelihood of death or serious bodily injury, increase by 9 levels." Application Note Six clarifies subsection (b)(2) is to be applied where "the public health is seriously endangered" and provides a guided departure depending on the circumstances of the case.[6] Defendants objected to the enhancement. The burden at sentencing was on the government to show the enhancement was appropriate by a preponderance of the evidence. *United States v. Byrd*, 689 F.3d 636, 640 (6th Cir. 2012).

Very few courts have had cause to analyze the application of § 2Q1.2(b)(2) in any detail.[7]

_____

[6] Such a departure was eventually granted in this case. The Court found there was insufficient evidence to conclude the offense conduct created a substantial likelihood of harm to neighbors or passersby. *See supra*, note 11. Due to this finding, the number of people put at risk was limited to on-site personnel. Accordingly, considering the number of people put at risk, the Court deemed a downward departure appropriate.

[7] The Court will discuss the two relevant cases below. The government also cited *United States v. Dillon*, 351 F.3d 1315 (10th Cir. 2003), which affirmed a district court's application of § 2Q1.2(b)(2) where the defendant stored ignitable hazardous waste without a permit. The Tenth Circuit held the district court's finding a fire was substantially likely to occur at the facility was not clear error and the § 2Q1.2(b)(2) enhancement was appropriate. *Dillon*, 351 F.3d at 1318-19 (citing *Pearson*, 274 F.3d at 1235). The Court also notes a handful of cases give cursory consideration of § 2Q1.2(b)(2). *See United States v. Ray*, No. 94-40901, slip op. at 1 (5th Cir. April 4, 1995)

At Defendants' sentencing hearing, the parties discussed at length two cases, *United States v. Thorn*, 317 F.3d 107 (2d Cir. 2003) and *United States v. Pearson*, 274 F.3d 1225 (9th Cir. 2001), dealing specifically with the application of § 2Q1.2(b)(2) to CAA violations involving asbestos. Additionally, Defendants cited a Sixth Circuit case, *Lindstrom v. A-C Product Liability Trust, et al.*, 424 F.3d 488 (6th Cir. 2005), which discussed asbestos exposure in the maritime products liability context.

### 1. *Thorn* and *Pearson*

*Thorn* involved an asbestos abatement company, A+ Environmental Services ("A+"), that employed approximately 700 people. 317 F.3d at 112. Over the course of nine years, the defendant "directed his workers to violate the rules and regulations governing the removal of asbestos at in excess of 1,100 separate facilities." *Id.* The defendant in *Thorn* concocted an elaborate scheme, duping not only relevant regulatory entities but also his customers. As a part of his scheme, he instructed his employees to perform "rip-and-run" or "rip-and-skip" abatements, which involved workers ripping asbestos from pipes "with little or no containment, resulting in the release of significant quantities of asbestos fibers into both the work area and other areas of the building." *Id.* Supposedly independent laboratories and air monitoring companies where integral in the defendant's scheme, helping him submit false air clearances, Occupational Safety and Health Administration ("OSHA") filings, medical clearances, and respiratory fit test results. Visible emissions occurred

_____

(affirming the district court's application of § 2Q1.2(b)(2) in one sentence); *United States v. Ivey*, 344 F. App'x 57, 59 (5th Cir. 2009) (citing *Thorn* as support of its conclusion USSG § 2D1.1 can apply where only a defendant's co-defendants were endangered by his conduct); *United States v. Halcomb*, No. 1:08-CR-46, 2010 WL 1959470 (W.D. Ky. May 17, 2010) (denying the government's procedural objection to the Magistrate Judge's determination the likelihood of bodily injury was not "substantial").

in nearly all the improper abatements and basic regulations were routinely violated, including failure to provide respirators to employees and to follow proper decontamination procedures. *Id.* at 113. One young employee, who was fourteen when he was hired, requested a respirator but was denied one by the defendant. The improperly removed materials were either sent to landfills dry and without bagging or were brought to the defendant's warehouse where his employees would turn bags inside out so the labels were not visible and dump the asbestos materials in normal dumpsters. Any dissent from his employees regarding the practices brought threats of termination.

After being convicted on all counts, the government presented evidence regarding health risks at the sentencing hearing. One witness, Dr. Stephen Levin, Medical Direct of the Mount Sinai–I.J. Selikoff Center for Occupational and Environmental Medicine and Director of the Selikoff Asbestos Archives and Research Center at the Mount Sinai School of Medicine, testified to the health risks faced by the defendant's employees. Dr. Levin explained, although risks of disease are proportional to the level of exposure to asbestos, "[t]here is no known dose threshold below which there is no increase in the risk of cancer." *Id.* at 114. After reviewing the evidence and conducting personal interviews with some of the workers, Dr. Levin expressed his opinion "that with virtual certainty among [A+'s] workers there will be asbestos-related disease, scarring lung disease with a very high probability, and also . . . a very high likelihood that among these workers lung cancer and mesothelioma is [sic] likely to occur." *Id.* at 115. Dr. Levin noted the likelihood specific workers whom he spoke with would develop asbestos-related disease. During cross examination, Dr. Levin was pressed on whether he could "with a reasonable degree of medical certainty" conclude one of A+'s employees would develop asbestos-related disease. Dr. Levin responded, "[I]f the test of within reasonable medical certainty is only 51 percent likelihood, I can say that without

9

question. I think the likelihood is far greater than that." *Id.* at 116. In spite of Dr. Levin's testimony and the proof presented at trial, the district court found the enhancement inappropriate. It explained,

> [T]here was too much uncertainty in the evidence both in terms of available medical science as well as evidence of exposure in the present case to say that with any degree of certainty any personnel suffered serious bodily injury or death. The people involved here did get involved voluntarily in the underlying criminal conduct, co-conspirators in most instances, they willfully refused to use available safety equipment which could reduce their risk of injury. There's just insufficient evidence to support the conclusion that any illness that might result from exposure to asbestos would cause serious bodily injury, so I'm not going to enhance it.

*Id.* at 118.

The Second Circuit reversed the district court's determination § 2Q1.2(b)(2) did not apply. The court noted "substantial likelihood" is not defined by the Guidelines or in case law, and it adopted the term's meaning as used in preliminary injunctions; that is, "substantial likelihood means considerably more likely." *Id.* at 117. The court then found two errors of law in the district court's analysis. First, contrary to the language used by the district judge, § 2Q1.2(b)(2) does not require any worker *actually* suffer bodily injury or death, but rather "applies when the offense resulted in a substantial likelihood of death or serious bodily injury." *Id.* at 118. Second, it is irrelevant whether the workers may have been co-conspirators. Additionally, and most relevant here, the court found the district court's factual finding regarding the uncertainty of the evidence clear error. The court conceded the facts in the case were complicated and A+'s workers were at heightened risk of developing injuries due to their chosen field and because they smoked. However, the court found those considerations ultimately irrelevant, and relied on Dr. Levin's "clear, undisputed testimony in the record that at least some of A+'s workers were considerably more likely, as a result of [the defendant's] Clean Air Act violations, to develop asbestos-related disease than if they had performed abatement under lawful conditions." *Id.* at 119. Because the evidence was undisputed, the court

10

found the defendant's conduct "resulted in a substantial likelihood that at least one, if not several, of his former employees would develop devastating, life-threatening, asbestos-related diseases." *Id.* at 119.

In *Pearson*, the Ninth Circuit affirmed the application of § 2Q1.2(b)(2) with much less discussion and record evidence than was present in *Thorn*. *Pearson* involved a Navy project to remove asbestos-containing material from a Naval Air Station in Washington. 274 F.3d at 1228. The Navy hired a contractor to perform the renovations, who hired subcontractor Environmental Maintenance Service, Inc. ("EMS") to perform the asbestos abatement. In the portion of the abatement relevant to the appeal, the defendant, who was hired by EMS to perform asbestos removal, oversaw removal of asbestos from a boiler house, boilers, and related equipment. Under the defendant's supervision, work practice standards were violated, such as using too little water to wet asbestos, leaving dry asbestos "all over the place," removing containment walls, not unclogging air machines, and placing bags of asbestos outside the containment area. *Id.* at 1228-29.

The district court applied the nine-level enhancement under § 2Q1.2(b)(2) after finding the defendant violated and instructed others to violate work practice standards. *Id.* at 1235. The Ninth Circuit affirmed the district court's application of § 2Q1.2(b)(2), agreeing that, because the defendant violated work practice standards, the defendant created a substantial likelihood that workers would be exposed to asbestos fibers. The court did not point to any testimony at sentencing regarding risks to specific workers or others, as the court in *Thorn* did, but merely relied on an OSHA fact sheet from 1993 detailing the serious health risks associated with exposure to asbestos. *Id.* ("The federal government has recognized asbestos as a health hazard and it is generally accepted that exposure to asbestos can cause mesothelioma, asbestosis, lung cancer; and cancers of the

11

esophagus, stomach, colon, and rectum.") (citing Occupational Safety & Health Administration Fact Sheet: Better Protection Against Asbestos in the Workplace (January 1, 1993), available at http://www.osha-slc.gov/OshDoc/Fact_data/FSNO93-06.html).

### 2. *Lindstrom*

In *Lindstrom*, a products liability case governed by maritime law, a merchant seaman sued a number of defendants whose products contained asbestos. 424 F.3d at 491. Over a thirty-one year career, the plaintiff was exposed to pieces of equipment containing asbestos in multiple vessels. After developing mesothelioma, he sued the manufacturers of many of these products on a number of civil claims, including product liability claims of design and manufacturing defects. The products liability claims were the only claims on appeal. The district court granted summary judgment in favor of all but one defendant and later entered a verdict in favor of that defendant after a bench trial.

The Sixth Circuit affirmed the district court's grants of summary judgment. The court concluded plaintiff's claims failed as to each defendant because he presented insufficient evidence of causation. In maritime products liability cases, the Sixth Circuit requires a plaintiff show (1) exposure to each defendant's product and (2) the product was a substantial factor in causing his injury. *Id.* at 492 (citing *Stark v. Armstrong World Indus., Inc.*, 21 F. App'x 371 (6th Cir. 2001)). A plaintiff may demonstrate the product was a "substantial factor" if it can show "substantial exposure" to the defendant's product. *Id.* "[M]inimal exposure" to a defendants' product does not prove the product itself was a substantial factor in causing the injury. The plaintiff must provide evidence of "a high enough level of exposure that an inference that the asbestos was a substantial factor in the injury is more than conjectural." *Id.* (quotations omitted). The plaintiff attempted to sidestep the substantial exposure requirement by providing direct evidence of causation in the form

of a single affidavit concluding that every exposure "however slight" was a substantial contributing factor in causing the plaintiff's illness. *Id.* at 493. The court affirmed the district court's conclusion the affidavit was insufficient as a matter of law, because a plaintiff must make a showing with respect to each defendant's product. The affidavit did not mention any particular defendant or product, but "rather states in a conclusory fashion that every exposure to asbestos was a substantial factor in [plaintiff's] illness." *Id.* This, the court held, was insufficient as a matter of law to establish causation under the *Stark* standard.

**B.      Arguments by the parties**

During the sentencing hearing the government and Defendants offered evidence regarding the likelihood of substantial bodily injury or death.

**1. Government**

The government called an expert, Tim Frederick, who also prepared a report submitted at the sentencing hearing (Court File No. 475-1). Frederick is a toxicologist and life scientist employed by the EPA. Frederick concluded, after reviewing trial testimony and evidence, there is "'a substantial likelihood of death or serious bodily injury' as a result of asbestos exposure due to improper demolition activities at the former Standard Coosa [Thatcher] facility" (*id.* at 1). Frederick's report discusses the general health risks associated with exposure to asbestos, including lung cancer, mesothelioma, and asbestosis (*id.*). At sentencing and in his report, Frederick noted various government and intergovernmental agencies, such as the National Institute of Occupational Safety and Health and the World Health Organizations' International Agency for Research on Cancers, have concluded no level of exposure to asbestos particles is risk free. Accordingly, Frederick explained, the EPA has also declined to "establish[] a numerical standard for asbestos in

13

ambient air" (*id.* at 1-2). Frederick did concede that OSHA has defined an occupational work standard of .1 fibers per cubic centimeter ("f/cc") (*id.* at 3).

Frederick explained the basic threat posed by asbestos exposure and then analyzed a number of studies. He admitted no studies were particularly on point to the facts of the case, but explained the studies he cited were the closest he could locate. One study from 1971 found a high concentration of airborne asbestos when removing pipe insulation using "dry methods", which entails removing asbestos without wetting the materials as required under NESHAPS (*id.* at 2). The study documented concentrations ranging from 7.0 f/cc to 895.6 f/cc with an average concentration of 152.25 f/cc (*id.*). In a study by the same author conducted in 1968, bagging dry asbestos released fibers in a concentration of 106 to 3815 f/cc (*id.*). A 1975 study involving dry removal of pipe insulation found concentrations of .3-13.8 f/cc; a 1968 study similarly found .2-26.3 with an average of 8.9 f/cc (*id.*).

After reviewing the evidence of improper removal in this case, Frederick concluded the workers at the SCT site must have been exposed to high levels of asbestos in ambient air (*id.* at 4). In addition to trial testimony, Frederick was shown photographs of the SCT site and posited that much of the material in the photographs likely contained asbestos, although he admitted he could not be sure without testing it. Considering the studies finding varied but substantial concentrations of asbestos fibers during dry removal processes similar to those performed at the SCT site, and the lack of proper respiratory gear, Frederick concluded "asbestos removal activity resulted in workers being exposed to airborne asbestos at concentrations such that there is a substantial likelihood of death or serious bodily injury to the exposed person(s)" (*id.*).

Of particular importance to Frederick, and to the government's argument, was the trial

testimony of Lisa Blackburn (Court File No. 411). Blackburn worked on Wood's crew removing asbestos. In addition to describing improper methods of removing RACM and cleaning the resulting debris, Blackburn's testimony carried additional heft because she was Wood's live-in girlfriend (*id.* at 4). At trial, she testified to sweeping scattered materials off the floor and observing others removing pipes from the building (*id.* at 6-10). These pipes would be cut with power saws. She described the insulation the pipes sometimes contained, which was consistent with asbestos containing insulation, and admitted removing insulation from the pipes (*id.* at 9-10). No protective clothing or respiratory gear was worn during this process (*id.* at 12). She explained the process of bagging the insulation and throwing it in "buggies" before eventually depositing the materials into dumpsters. She also discussed the demolition process, which occasionally involved the use of a trackhoe to demolish parts of the buildings, including pipes (*id.* at 18).

The government also submitted an incident report conducted by the APC after the discovery of the SCT site (Court File No. 464-4). The report describes the discovery of the site by an APC official, who happened upon the property and noticed debris with suspected friable asbestos (*id.* at 2).[8] Three samples of suspected asbestos containing materials were taken from the property and tested; one sample was negative for asbestos, one was 3% Chrysotile Asbestos and 15% Amosite Asbestos, and the last was 10% Chrysotile Asbestos and 7% Amosite Asbestos (*id.* at 3). After the APC confronted the Fillers about the site, Defendants instructed ADC to begin properly removing additional asbestos containing material still on the property. The report describes a conversation with Herbert Warden of ADC, who informed the APC he noticed additional asbestos material but

---

[8] "Friable" asbestos refers to asbestos in a form easily broken into smaller pieces such that asbestos particles would be released into the air if disturbed.

15

Donald Fillers told him not to remove it (*id.* at 4). The APC visited the site after the conversation with Warden where he showed them one hundred properly sealed bags containing asbestos materials ADC had removed from the SCT site after the APC discovered it (*id.*). The report describes other interviews with Warden informing the APC of instances prior to its discovery of the site when he found asbestos containing materials outside of the original contract area and informed Donald Fillers (*id.* at 3). Donald Fillers reportedly instructed Warden not to remove the additional materials because he had employees who would remove them for six dollars an hour (*id.*).

After submitting this evidence at sentencing, the government argued the § 2Q1.2(b)(2) enhancement was appropriate in this case. Namely, the government noted Frederick's testimony regarding probable levels of exposure and the danger posed by any exposure to asbestos. The APC incident report described RACM haphazardly strewn about the property. This is consistent with Blackburn's testimony, as well as others who testified at trial, which discussed sweeping, cutting, dry bagging, and dumping asbestos without any protective gear. The government concluded that the workers on Wood's crew must have been exposed to asbestos, no level of exposure to asbestos is safe, and therefore they now faced a substantial likelihood of death or serious bodily injury.

### 2. Defendants

Defendants countered the government's evidence with experts and exhibits of their own. First, Defendants emphasized the lack of evidence of ambient air contamination. From September 27 to October 1, 2004, which was during ADC's remediation, air samples were taken that detected low levels of asbestos, ranging from .005 to .06 (Court File No. 457-9). Further, after the APC found the SCT site in September 2005, it performed air sample tests of its own, again finding very low concentration of asbestos fibers in the air (Court File No. 457-10).

16

Second, Defendants offered the testimony and report of Deborah Zimmerman (Court File No. 457-7). Zimmerman is a project manager and accredited asbestos inspector who has worked extensively as an environmental consultant. The thrust of Zimmerman's report and testimony is a comparison of the estimated amount of asbestos in the AAI survey and the amount ADC removed. Zimmerman totaled the waste manifests completed by ADC in September and October 2004, which reported a total of 240 cubic yards of RACM properly disposed of by ADC (*id.* at 7). Zimmerman then submitted the original AAI report to a number of experienced abatement contractors, who submitted estimated waste totals. The estimates ranged from 163 to 280 cubic yards, with an average estimate of 204 cubic yards (*id.* at 8). Zimmerman also noted much of the asbestos material identified on the property was in good condition or likely non-friable, including the samples on which the APC performed tests in September 2005 (*id.*). Zimmerman concludes, based on the estimates and the amount of RACM actually removed from the property by ADC, little or no asbestos must have been improperly removed (*id.* at 9). Additionally, Zimmerman was shown the same photographs Frederick observed during his testimony and drew the opposite conclusions, describing the materials as almost certainly fiberglass based.

Finally, Defendants countered Frederick's testimony with a report by Laurence Durio, an industrial hygienist who did not testify at the sentencing hearing (Court File No. 458-8). Durio's report is not so much an independent report as a line-by-line attack of Frederick's report. Durio attempts to poke holes in nearly every point made by Frederick. If Durio's report has any thesis, he argues there is no evidence in this case of exposure in sufficient quantity to cause harm to any of the salvage crew or the general public. In contrast to Frederick, Durio contends not all exposure to asbestos poses a risk to health. Durio points to OSHA's exposure limit of .1 f/cc in support of his

contention. Durio also distinguishes the studies cited by Frederick as being performed under different conditions from those present in this case, such as the inside of a naval vessel with no ventilation.

In addition to tearing down Frederick's report, Durio points to a report of asbestos exposure after the collapse of the World Trade Center (*id.* at 13). Close to two months after September 11, 2001, the New York Department of Health and Mental Hygiene and the U.S. Agency for Toxic Substances & Disease Registry of the Centers for Disease Control studied the health effects of exposure to asbestos fibers released into the air after the buildings collapsed. The report concluded there were no anticipated adverse health effects to the residents in the surrounding areas. The study tested asbestos levels in the resulting dust and found a concentration of only .003 f/cc. Combining the conclusions of this study with the ambient air testing performed in this case, Durio concludes any risk posed by exposure was negligible and little more than "statistical noise."

Defendants pointed to Zimmerman's report and concluded very little, if any, asbestos must have been improperly removed from the SCT site. The low concentration of asbestos in the ambient air tests corroborates Zimmerman's conclusion. Defendants then pointed to Durio's report and asserted low levels of exposure to asbestos do not pose significant health risks. The World Trade Center report, Defendants argued, supports this conclusion. Further, the Sixth Circuit in *Lindstrom* recognized more than minimal exposure is necessary to produce negative health effects. Thus the § 2Q1.2(b)(2) enhancement should not apply because the government did not meet its burden to demonstrate a substantial likelihood of death or serious bodily injury.

C.    **Application**

1. **Consideration of the evidence**

18

As an initial matter, the Court recognized Defendants were convicted of conspiracy to violate the CAA and of actual violations of the CAA, including various work practice standards. Much of the sentencing hearing involved arguments refuting the jury's verdict as based on insufficient evidence or simply as an improper application of the law to the evidence. The Court must, and did, give full effect to the jury's verdict. Accordingly, the Court noted Defendants improperly removed asbestos in violation of CAA work practice standards. The Court considered it established Defendants demolished portions of the site before removing asbestos, removed dry asbestos without wetting it down, failed to properly lower asbestos material, and failed to containerize and timely dispose of RACM.[9]

The Court considered the testimony and evidence submitted by the parties. The Court found Frederick's report helpful, but also considered his employment at the EPA, which was one of the investigating bodies in this case, and weighted his testimony accordingly. However, the Court found Frederick's testimony noting the consensus opinion that there is no safe level of exposure to asbestos compelling. This conclusion is in keeping with discussion of asbestos exposure in *Thorn* and *Pearson*. *See Thorn*, 317 F.3d at 119; *Pearson*, 274 F.3d at 1235. Further, the Court did not find Defendants' reliance on *Lindstrom* persuasive. *Lindstrom* analyzed causation of an actual harm, not a likelihood of harm. The purpose of the "substantial exposure" requirement discussed in *Lindstrom* is not to establish exposure to a defendant's product was sufficient to cause harm. Rather, the "substantial exposure" requirement is necessary to demonstrate enough exposure to one defendant's product to differentiate it from other products also capable of causing the same harm. *See*

_____

[9] Mathis was not convicted of all these violations directly. He was, however, convicted of conspiring to violate the CAA, and is responsible for the consequences of the conspiracy.

19

*Lindstrom*, 424 F.3d at 492.  Here, in contrast, the Court had to determine whether Defendants' actions created a substantial likelihood of harm, not, as the *Thorn* court explicitly noted, whether harm actually resulted, or would actually result from Defendants' conduct.  *See Thorn*, 317 F.3d at 118.

The Court was not impressed with Defendants' experts.  Zimmerman was passionate and emotional during her testimony at sentencing, which is suggestive of bias.  This bias may have accounted for the stark difference between Zimmerman's and Frederick's conclusions based on the same evidence.  As noted, the Court must give the jury's verdict full effect.  It proceeded with the assumption asbestos was on the property when demolition occurred and Defendants removed asbestos in violation of work practice standards.  Zimmerman's report attempted to show no or very little asbestos was present or improperly removed from the SCT site.[10]  The Court, however, could not ignore the jury's verdict to the contrary.  Further, with respect to Zimmerman's comparison of waste totals, the Court finds her logic unconvincing.  The AAI survey was a rough estimate and was not intended to reflect the actual amount of asbestos present in the building.  Indeed, due to the nature of asbestos insulation, it is almost impossible to accurately determine the final amount of asbestos on the property before actual removal.  This is evidenced by the change orders Defendant Fillers authorized for ADC.  Additionally, Halbert Warden's testimony at trial established the salvage crew was throwing improperly abated RACM into ADC's dumpsters.  The waste totals would then at least partially include improperly removed RACM.

The Court also discounted Durio's report, which was polemical and full of ad hominem

---

[10] Indeed, at sentencing Zimmerman testified with great passion to her belief the conviction was based on insufficient and improper evidence.  To the extent her report was intended to further that theory, the Court could not consider it.

20

attacks against Frederick. Beyond criticizing Frederick's assumptions and choice of words, Durio's report added very little to the Court's analysis. To the extent Durio argued minimal exposure to asbestos particles does not pose a risk to health, the Court found his position in opposition to the majority view, which holds no level of exposure is safe, and disregarded it.

Although Defendants placed significant weight on the lack of asbestos detected in ambient air, the Court found this lack of evidence unconvincing. Air testing was performed on the site only during ADC's abatement in 2004 and after the APC found the site in disarray in 2005. The Court finds it likely Defendants would have avoided doing improper abatement during the time ADC was testing, and indeed trial testimony suggested Defendants sought at various times to prevent ADC from becoming aware of their actions. This is clear from testimony at trial describing asbestos materials disappearing overnight. As to the APC tests, Frederick testified rain fell shortly before testing, which can force the ambient asbestos particles to the ground. Further, to the extent Defendants argued air samples showing high levels of asbestos are necessary to support the § 2Q1.2(b)(2) enhancement, the Court was unwilling to create such a requirement. By the very nature of the CAA violations, air sampling will rarely, if ever, be performed simultaneously with improper removal of asbestos. Accordingly, lack of air samples showing high levels of asbestos will not alone prevent the application of § 2Q1.2(b)(2).

The Court also considered the studies offered by the parties, but did not find any particularly helpful. This case dealt with illegal demolition and removal. Studies of legal removal were too readily distinguishable to the facts of the case at hand to have an effect on the Court's determination. The studies discussed by Frederick were performed under different circumstances from the events in this case, such as in small and enclosed spaces with different kinds of materials. The Court did

21

not believe it could rely on those studies to determine the amount of airborne asbestos on the SCT site. As to the World Trade Center report, the Court was not convinced its findings were relevant here. The area surrounding the World Trade Center was evacuated for weeks following the collapse of the buildings. During this time, the area was partially cleaned of dust and debris. The testing performed in the study did not begin until two months after the collapse of the buildings. Further, the area around the World Trade Center is among the most expensive real estate in the world. The local residents had the resources and capability to ensure their neighborhood was promptly cleaned and to spend time living in other homes, homes of friends, or hotels in surrounding areas during cleanup. A more relevant study for the purposes of this case would have examined the effect on the workers cleaning the area, rather than the residents who lived there.

### 2. Findings of fact

The Court made the following findings of fact at the sentencing hearing. As detailed in Frederick's report, breathing in asbestos fibers causes a number of very serious and potentially deadly diseases and ailments. No exposure to asbestos is proven safe. The corollary to this is that any exposure to asbestos is potentially hazardous. Then, to the extent there was a controversy among the parties regarding the risk posed by minimal exposure to asbestos, the Court found even minimal exposure to asbestos causes health risks. This is consistent with the *Thorn* and *Pearson* courts, *see Thorn*, 317 F.3d at 119; *Pearson*, 274 F.3d at 1235, and with the majority medical view.

When Defendants violated work practice standards regarding the handling of asbestos they created a risk asbestos would be released into the air. The Court found workers engaged in activities that disturbed, disassembled, and separated asbestos containing materials in violation of CAA work practice standards. While ADC was properly removing asbestos from parts of the SCT site, workers

22

improperly stripped and demolished other portions of the site. When ADC finished abatement,

asbestos remained on the property and workers continued improperly removing it. Some of this

work involved cutting pipes containing asbestos insulation with power tools or manually removing

asbestos insulation from pipes and pipe fittings. During performance of these tasks, workers were

necessarily exposed to asbestos fibers released by the processes of cutting with power tools, using

hand tools to remove materials from pipes, and sweeping asbestos debris from the floor. Because

of the lack of protective clothing and respiratory gear, the workers, such as Lisa Blackburn, were

exposed to the fibers and must have breathed the fibers into their lungs.[11] The Court's finding, then,

was the members of the salvage crew were not only exposed to asbestos fibers, but actually inhaled

them.

### 3. Court's holding

Bearing in mind the facts the Court found and the violations for which Defendants were

convicted, the Court had to conclude whether an enhancement under § 2Q1.2(b)(2) was appropriate

in this case. Although it is good law, the Court did not apply *Pearson*, because it creates a *per se*

enhancement when a defendant violates a work practice standard. Rather, the Court applied the

*Thorn* standard. That is, the Court had to find Defendants' CAA violations made it considerably

more likely a worker would suffer death or a serious bodily injury, such as developing an injury

involving extreme physical pain or the protracted impairment of a function of a bodily member,

organ, or mental faculty, or requiring medical intervention such as surgery, hospitalization, or

---

[11] Testimony at trial regarding clouds of dust emanating from the SCT site was discussed in the PSR and at trial. However, the Court found there was insufficient evidence to conclude asbestos fibers were present in the dust. The Court could not find neighbors, passersby, or others in the area suffered a substantial likelihood of death or serious bodily injury. The Court's finding on § 2Q1.2(b)(2) was based only on the exposure of the workers present on the site.

physical rehabilitation. As noted in *Thorn*, death or serious bodily injury need not actually result from the offense conduct; rather, actual death or serious bodily injury is grounds for an upward departure. Whether a person is considerably more likely to suffer death or serious bodily injury cannot be measured, predicted, or determined with mathematical precision. The Guidelines require the determination be made without such precision, and call upon the Court to make a reasonable estimation. The Court did so at the sentencing hearing.

As discussed above, the Court found workers were unprotected, worked on dry asbestos, and must have inhaled asbestos particles into their lungs. The Court also found, based on testimony at trial as well as its consideration of *Thorn* and *Pearson*, even minimal levels of exposure to asbestos fibers pose significant health risks. The Court thus concluded, based upon a preponderance of the evidence, the workers at the SCT site were considerably more likely to develop an injury involving extreme physical pain or the protracted impairment of a function of a bodily member, organ, or mental faculty. Accordingly, the Court denied Defendants' objections to the enhancement assessed under USSG § 2Q1.2(b)(2).

## III. CONCLUSION

For the reasons discussed above, the Court denied Defendants' objections to the nine-level enhancement assessed pursuant to USSG § 2Q1.2(b)(2).

/s/_____
**CURTIS L. COLLIER**
**UNITED STATES DISTRICT JUDGE**

24